Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor, Appellant,

v.

WADE LAHAR CONSTRUCTION COMPANY, a Corporation, Appellee.

Nos. 16509, 16510.

United States Court of Appeals Eighth Circuit.

April 13, 1961.

Bessie Margolin, Asst. Sol., U. S. Dept. of Labor, Washington, D. C., for appellant. Harold C. Nystrom, Acting Sol., and Beate Bloch, Atty., U. S. Dept. of Labor, Washington, D. C., and Earl Street, Regional Atty., Dept. of Labor, Dallas, Tex., were with her on the brief.

Herschel H. Friday, Jr., Little Rock, Ark., for appellee.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and REGISTER, District Judge.

BLACKMUN, Circuit Judge.

These are companion cases instituted by the Secretary of Labor under § 17 and § 16(c), respectively, of the Fair Labor Standards Act of 1938, Chapter 676, 52 Stat. 1060, as amended, now found as 29 U.S.C.A. § 201 et seq.[1] The complaint in the first action alleges violations by the defendant of the Act's minimum wage, maximum hours, and record keeping provisions and demands injunctive relief. The second action seeks compensation for 29 named employees of the defendant. The District Court held that the employees were engaged neither "in commerce" nor "in the production of goods for commerce" within the meaning of the Act. As a consequence, it dismissed both complaints. 179 F.Supp. 551. The Secretary has appealed.

The pertinent facts are set forth with meticulous detail in Judge Miller's opinion below. They need not be repeated at length here. We stress the following:

1. The defendant is a general contractor which has participated in reservoir clearing projects and other similar work throughout the country. Its president has been active in endeavors of this kind for the government since 1931.

2. Of the 29 employees here involved, only 3 are concerned with both the wage and overtime provisions of the statute. The remaining 26 are concerned only with overtime. It is conceded that the Act's overtime requirements were not met.

3. The project is the Table Rock Dam and Reservoir on the White River. This stream rises in the mountains of northwest Arkansas, flows northeasterly 215 miles into Missouri, and then flows southeasterly back into Arkansas for a distance of 505 miles where it empties into the Mississippi upstream from Arkansas City. Table Rock Dam itself was completed in 1959[2] and is situated in Taney County, Missouri, near the town of Branson. The reservoir it creates extends its arms into Barry and Stone Counties, Missouri, and into Boone and Carroll Counties, Arkansas.

4. The basic authority for the construction of the Table Rock project is found in House Document No. 917, 76th Congress, 3rd Session. This consists of

1. Subsequent references herein to the Act are to sections as amended and as numbered in U.S.C.A.

2. This does not render the injunction case moot. Chambers Construction Company v. Mitchell, 8 Cir., 233 F.2d 717, 725. See Walling v. Helmerich & Payne, 323 U.S. 37, 43, 65 S.Ct. 11, 89 L.Ed. 29.

reports and recommendations transmitted in 1940 to the House Committee on Flood Control. The projects recommended therein came to be authorized by the Flood Control Act of 1941, 55 Stat. 638, 645, which referred to "the prosecution of the comprehensive plan approved in the Act of June 28, 1938, for the White River Basin in Missouri and Arkansas, including the projects for flood control and other purposes recommended by the Chief of Engineers in House Document Numbered 917 * * *". The plan admittedly had as its primary purposes aid to navigation on the lower White and Mississippi Rivers, flood control, generation of electric power, and recreation.

5. The Table Rock project is the third in a series of dams built on the White and its tributaries. The first was the Norfork Dam and Reservoir in Arkansas completed in 1943. The second was the Bull Shoals Dam and Reservoir, also in Arkansas, completed in 1952. Both of these are downstream from Table Rock. The fourth is to be upstream near Beaver, Arkansas. The entire development of the White River Basin is under the supervision of the Army Corps of Engineers.

6. The defendant obtained, as a result of bids, two contracts for clearance on the Table Rock project. The work proposal submitted by the Corps listed wage scales to be paid and mentioned the Eight-Hour Law, 27 Stat. 340, as amended, now found as 40 U.S.C.A. § 321 et seq., and two other statutes. It made no reference to the Fair Labor Standards Act.

7. The defendant's clearance work involved certain areas of the reservoir in both Arkansas and Missouri but specifically did *not* involve the damsite itself. The clearing for the dam's immediate area was performed by another contractor.

8. The cost of the defendant's work was paid by the government out of appropriations for the overall project.

9. The reservoir has a series of "pools" located between elevations or contours. The normal level of the water in the reservoir is at Elevation 915 and the "power pool" consists of the area between that elevation and the lower Elevation 846. The area between Elevation 915 and 936 (or thereabouts) is the "flood pool" which will contain water only during periods of flood. The entire reservoir up to 936 contains approximately 52,000 acres. 10,000 of these lie above 915.

10. Complete clearing of all timber was accomplished in certain areas from Elevation 915 down to either 874 or 840 (the clearing to the lower of these was in the public use areas). In certain other areas only modified clearing was effected down to 874 or 840. This consisted of clearing, by removal or topping, of only those trees which projected above the stated elevation but most of the trees where this type of clearing was performed were left standing. Trash and brush were allowed to remain there. The practice was to clear only one side of the stream and to leave the opposite side totally uncleared. In still other areas, no clearing of any kind was effected even though these locations were between the same contour lines as the areas for clearance or modified clearance. In the flood pool itself there was no clearing. The defendant's work, on both complete and modified clearance, covered 12,700 acres and 122 miles of a total of 857 miles of "shoreline".

■■ The Secretary's position on appeal is that the clearing work, being on a multiple purpose project constructed with federal funds as a part of the comprehensive development program of the White River Basin for the combined purposes of navigation improvement, flood control, power, and other beneficial uses, "is in practical effect so integral a part of the improvement of an interstate instrumentality as to be 'in commerce' within the coverage" of the Act. He cites as controlling the 1952 case of Tobin v. Pennington-Winter Const. Co., 10 Cir., 198 F.2d 334, certiorari denied sub nom. Pennington-Winter Construction Co. v. Durkin, 345 U.S. 915, 73 S.Ct. 727, 97 L.Ed. 1349. He also refers to the es-

tablished propositions that the determination of need for a particular government project is a matter of legislative judgment and is not for the courts and that the Congress under the commerce clause may constitutionally reach the lesser aspects of a single primary project. He urges that the same "practical realistic approach" is applicable to coverage under the Act. He argues secondarily that the employees here were engaged in improving the navigability of a waterway between two states and that for this reason they are covered.

The defendant's position is that the facts of each case must control its disposition; that the recent case of Mitchell v. H. B. Zachry Co., 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753, not mentioned in the Secretary's brief, is significant; that the general propositions urged by the Secretary have no application here; that Pennington-Winter is not relevant; that the record is silent as to the use of the reservoir for commerce; and that such use in any event is purely local.

*The statute.* § 206(a) establishes the minimum wage:

"Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates—* * *"

§ 207(a) is concerned with maximum hours:

"Except as otherwise provided in this section, no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

§ 211(c) requires apropriate records. Violation of these provisions is made unlawful by § 215(a) (2) and (5). § 217 and § 216(c) authorize actions, such as these, by the Secretary.

The terms "in commerce" and "in the production of goods for commerce" appear not only in § 206(a) and § 207(a) but, as well, in § 202(a) setting forth the findings of Congress, and in § 208(a). They are, of course, vital in the interpretation and application of the Act. Some of the words in these phrases are in turn defined in § 203.[3]

*The Supreme Court authority.* Those sections of the Act which are involved here have been the subject of extensive litigation. Since February 3, 1941, when a united court held the Act to be within the commerce power of Congress and not violative of the Fifth and Tenth Amendments, United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609; Opp Cotton Mills v. Administrator of Wage and Hour Division, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624, these sec-

---

3. "§ 203. Definitions * * *

"(b) 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof.

* * * * *

"(i) 'Goods' means goods * * * wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof.

"(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State."

Subsection (j) assumed its present form by amendment in 1949. Prior thereto its last clause read "or in any * * * process or occupation necessary to the production thereof, in any State." The amendment thus inserted "closely related" before "process" and substituted "directly essential" for the word "necessary".

tions have been subjected to scrutiny and interpretation in over 30 cases in the Supreme Court itself.[4]

While some of these decisions by our highest court have been unanimous, most of them have not and in several instances the particular case or the entire decisional process in this statutory area has been characterized as presenting "a difficult problem" (Lublin, 358 U.S. at page 212, 79 S.Ct. at page 264), as "rewarding as an attempt to square the circle" (Kirschbaum, 316 U.S. at page 520, 62 S.Ct. at page 1118), as requiring "painstaking appraisal of all the variant elements" and as involving "matters of the nicest degree" (Zachry, 362 U.S. at pages 315 and 321, 80 S.Ct. at page 743).

The Court has often intimated that much of the difficulty may be due to the absence of aid afforded by a preliminary administrative process and the consequent placing upon the courts of "the independent responsibility of applying *ad*

---

4. Kirschbaum Co. v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Overnight Motor Transp. Co. v. Missel, 1942, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Warren-Bradshaw Drilling Co. v. Hall, 1942, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83; Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Higgins v. Carr Bros. Co., 1943, 317 U.S. 572, 63 S.Ct. 337, 87 L.Ed. 468; Overstreet v. North Shore Corp., 1943, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656; Pedersen v. J. F. Fitzgerald Construction Co., 1943, 318 U.S. 740, 742, 63 S.Ct. 558, 87 L.Ed. 1119, reversing per curiam 288 N.Y. 687, 43 N.E.2d 83; McLeod v. Threlkeld, 1943, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538; Walton v. Southern Package Corp., 1944, 320 U.S. 540, 64 S.Ct. 320, 88 L.Ed. 298; Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 1944, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949; Addison v. Holly Hill Fruit Products, Inc., 1944, 322 U.S. 607, 64 S.Ct. 1215, 88 L. Ed. 1488; Armour & Co. v. Wantock, 1944, 323 U.S. 126, 65 S.Ct. 165, 89 L. Ed. 118; Skidmore v. Swift & Co., 1944, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124; A. H. Phillips Inc. v. Walling, 1945, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095; 10 East 40th St. Bldg., Inc. v. Callus, 1945, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806; Borden Co. v. Borella, 1945, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865; Roland Electrical Co. v. Walling, 1946, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383; Martino v. Michigan Window Cleaning Co., 1946, 327 U.S. 173, 66 S.Ct. 379, 90 L.Ed. 603; Mabee v. White Plains Pub. Co., 1946, 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607; Boutell v. Walling, 1946, 327 U.S. 463, 66 S.Ct. 631, 90 L.Ed. 786; D. A. Schulte, Inc. v. Gangi, 1946, 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114; Walling v. Portland Terminal Co., 1947, 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809; Murphey v. Reed, 1948, 335 U.S. 865, 69 S.Ct. 105, 93 L.Ed. 410; Farmers Reservoir Irrigation Co. v. McComb, 1949, 337 U.S. 755, 69 S.Ct. 1274, 93 L.Ed. 1672; Powell v. United States Cartridge Co., 1950, 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017; Alstate Construction Co. v. Durkin, 1953, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745; Thomas v. Hempt Bros., 1953, 345 U.S. 19, 73 S.Ct. 568, 97 L.Ed. 751; Mitchell v. Joyce Agency, Inc., 1955, 348 U.S. 945, 75 S.Ct. 436, 99 L.Ed. 740; Mitchell v. C. W. Vollmer & Co., 1955, 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196; Mitchell v. Lublin, McGaughy & Associates 1959, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243; Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753. There are additional cases which, while they involve other sections of the Act, are revealing and helpful for the solution of our present problem: Anderson v. Mt. Clemens Pottery Co., 1946, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515; Bay Ridge Operating Co. v. Aaron, 1948, 334 U.S. 446, 68 S.Ct. 1186, 92 L.Ed. 1502; Maneja v. Waialua Agricultural Co., 1955, 349 U.S. 254, 75 S.Ct. 719, 99 L.Ed. 1040; Steiner v. Mitchell, 1956, 350 U.S. 247, 76 S.Ct. 330, 100 L.Ed. 267; Mitchell v. King Packing Co., 1956, 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282; Mitchell v. Budd, 1956, 350 U.S. 473, 76 S.Ct. 527, 100 L.Ed. 565; Mitchell v. Kentucky Finance Co., 1959, 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815; Arnold v. Ben Kanowsky, Inc., 1960, 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393.

These cases are gathered in this footnote in the hope that their citation here will simplify the reading of this opinion. They will usually be referred to later by their respective primary names. We cite them all, moreover, to show the warmth of the issues which have been generated under the Act, the obvious complexity of the problems and, as brought out below, the closeness of the lines that have been drawn.

*hoc* the general terms of the statute to an infinite variety of complicated industrial situations"; to the fact that the Act, in contrast to certain other important federal regulatory legislation, stops short of limits which might constitutionally have been reached (Kirschbaum, 316 U.S. at page 523, 62 S.Ct. at page 1120; 10 East 40th St., 325 U.S. at pages 579–580, 65 S.Ct. at page 1228); and to the lack of certain statutory definitions (Bay Ridge, 334 U.S. at page 460, 68 S.Ct. at page 1194; Zachry, 362 U.S. at page 320, 80 S.Ct. at page 745). The result is that the courts find themselves involved "in the empiric process of drawing lines from case to case, and inevitably nice lines" (10 East 40th St., 325 U.S. at page 579, 65 S.Ct. at page 1228), and in dealing "with doubtful instances" Threlkeld, 319 U.S. at page 495, 63 S.Ct. at page 1250).

With this difficulty announced and recognized, the Court, in applying the Act, nevertheless has "tried to state with candor the larger considerations of national policy, legislative history, and administrative practicalities that underlie the variations in the terms of Congressional commercial regulatory measures and which therefore should govern their judicial construction" (Kirschbaum, 316 U.S. at page 523, 62 S.Ct. at page 1120). Against this background the following matters of note and emphasis emerge:

■ 1. As already indicated, Congress, in producing the Act, did not make it coextensive with the limits of its power over commerce. "The history of the legislation leaves no doubt that Congress chose not to enter areas which it might have occupied" (Kirschbaum, 316 U.S. at page 522, 62 S.Ct. at page 1119; Overstreet, 318 U.S. at page 128, 63 S.Ct. at page 496).

2. This necessarily means that there is a remaining area which is the subject for appropriate state regulation. Congress "indicated its purpose to leave local

business to the protection of the states" (Jacksonville Paper, 317 U.S. at page 570, 63 S.Ct. at page 336; 10 East 40th St., 325 U.S. at page 582, 65 S.Ct. at page 1229; Waialua, 349 U.S. at page 272, 75 S.Ct. at page 729; Zachry, 362 U.S. at page 314, 80 S.Ct. at page 742).

3. This less-than-complete coverage is manifested and occasioned by the Act's failure to contain, with respect to interstate commerce, such words as "affecting" or "promoting" rather than the narrower "engaged in commerce or in the production of goods for commerce" (Polish National Alliance v. National Labor Relations Board, 322 U.S. 643, 647, 64 S.Ct. 1196, 88 L.Ed. 1509; Carr, 317 U.S. at page 574, 63 S.Ct. at page 338; Threlkeld, 319 U.S. at page 493, 63 S.Ct. at page 1249; Lublin, 358 U.S. at page 211, 79 S.Ct. at page 263).

■ 4. This fact of restricted coverage, however, "is no reason for narrowly circumscribing the phrase 'engaged in commerce'" (Overstreet, 318 U.S. at page 128, 63 S.Ct. at page 496; Lublin, 358 U.S. at page 211, 79 S.Ct. at page 263). Indeed, it is to be construed liberally, recognizing "that the purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce" (Jacksonville Paper, 317 U.S. at page 567, 63 S.Ct. at page 335; Overstreet, 318 U.S. at page 128, 63 S.Ct. at page 496; Zachry, 362 U.S. at page 320, 80 S.Ct. at page 745) limited only by the reach of the Act itself (Threlkeld, 319 U.S. at page 493, 63 S.Ct. at page 1249). See also Mitchell v. Kroger Company, 8 Cir., 248 F.2d 935, 938. We are said to be dealing with an Act "that has been given a liberal construction from Kirschbaum * * * to Alstate * * *" (Vollmer, 349 U.S. at page 429, 75 S.Ct. at page 862).[5] The statute "must not be interpreted or applied in a narrow, grudging manner" (Tennessee Coal, 321 U.S. at page 597, 64 S.Ct. at page 703).

---

5. "The liberal construction given the Act from Kirschbaum * * * to Alstate * * * and down to and including the Vollmer case is now forsaken". Mr. Justice Douglas dissenting, with others, in Zachry, 362 U.S. at page 322, 80 S.Ct. at page 746.

■ 5. On the other hand courts are to bear in mind that "it is no warrant for extending a statute that experience may disclose that it should have been made more comprehensive" (Holly Hill, 322 U.S. at page 617, 64 S.Ct. at page 1221); they are to be alert "not to absorb by adjudication essentially local activities that Congress did not see fit to take over by legislation" (10 East 40th St., 325 U.S. at pages 582–583, 65 S.Ct. at page 1229; Zachry, 362 U.S. at page 314, 80 S.Ct. at page 472).

■ 6. The provisions of the Act "are remedial and humanitarian in purpose" (Tennessee Coal, 321 U.S. at page 597, 64 S.Ct. at page 703) and the statute "was based on findings and a declaration of broad policy" (Holly Hill, 322 U.S. at page 616, 64 S.Ct. at page 1221).

7. It is said that "decisions dealing with various assertions of state or federal power in the commerce field are not particularly helpful in determining the reach of this Act" (Jacksonville Paper, 317 U.S. at page 569, 63 S.Ct. at page 336; Kirschbaum, 316 U.S. at pages 520–521, 62 S.Ct. at pages 1118, 1119) and that there is "no single concept of interstate commerce which can be applied to every federal statute regulating commerce" (Threlkeld, 319 U.S. at page 495, 63 S.Ct. at page 1250).

■ 8. Nevertheless, the observation made, in Swift and Company v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518, with respect to the constitutional scope of the commerce power, that "commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business" has been applied "as a starting point for inquiry whether a particular business is 'in commerce' within the meaning of this Act" (Jacksonville Paper, 317 U.S. at page 570, 63 S.Ct. at page 336).

■ 9. The application of the Act is "dependent upon the character of the employees' activities" and not upon those of the employer (Kirschbaum, 316 U.S. at page 524, 62 S.Ct. at page 1120; War-ren-Bradshaw, 317 U.S. at page 90, 63 S.Ct. at page 126; Jacksonville Paper, 317 U.S. at page 571, 63 S.Ct. at page 336; Overstreet, 318 U.S. at page 132, 63 S.Ct. at page 498; Threlkeld, 319 U.S. at page 497, 63 S.Ct. at page 1251; Lublin, 358 U.S. at page 211, 79 S.Ct. at page 263; Zachry, 362 U.S. at page 315, 80 S.Ct. at page 743). The fact an employer may be engaged in commerce or in the production of goods for commerce does not mean that all his employees are necessarily covered by the Act (White Plains, 327 U.S. at page 184, 66 S.Ct. at page 514).

■ 10. Tests have been evolved. In cases where the "in commerce" phrase is in issue the test "is not whether the employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it" (Threlkeld, 319 U.S. at page 497, 63 S.Ct. at page 1251; Boutell, 327 U.S. at page 466, 66 S.Ct. at page 633) or "whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity" (Vollmer, 349 U.S. at page 429, 75 S.Ct. at page 862; Lublin, 358 U.S. at page 212, 79 S.Ct. at page 264; Mitchell v. Brown, 8 Cir., 224 F.2d 359, 363, certiorari denied 350 U.S. 875, 76 S.Ct. 119, 100 L.Ed. 773.) Where the "production of goods for commerce" phrase is involved the test, at least before the 1949 amendment, was whether the work has "a close and immediate tie with the process of production for commerce" (Kirschbaum, 316 U.S. at page 525, 62 S.Ct. at page 1121; Borden, 325 U.S. at page 682, 65 S.Ct. at page 1224; Roland, 326 U.S. at page 665, 66 S.Ct. at page 416; Farmers Irrigation, 337 U.S. at page 759, 69 S.Ct. at page 1276; Waialua, 349 U.S. at page 271, 75 S.Ct. at page 729). "Whatever terminology is used, the criterion is necessarily one of degree and must be so defined" (Kirschbaum, 316 U.S. at page 526, 62 S.Ct. at page 1121). Since 1949 it is still re-

quired "that we once again apply the formulation set down in Kirschbaum, which, in light of the 1949 amendment, we must do with renewed awareness of the purpose of Congress to avoid intrusion into withdrawn local activities" (Zachry, 362 U.S. at page 318, 80 S.Ct. at page 745).

■ 11. The "test of whether one is in commerce is obviously more exacting than the test of whether his occupation is necessary to production for commerce" (Armour, 323 U.S. at page 131, 65 S.Ct. at page 168; Tobin v. Johnson, 8 Cir., 198 F.2d 130, 132, certiorari denied sub nom. Johnson v. Durkin, 345 U.S. 915, 73 S.Ct. 726, 97 L.Ed. 1349; Hertz Drivurself Stations v. United States, 8 Cir., 150 F.2d 923, 926).

12. No precise formula or hard and fast rule which will resolve all cases is available. "Formulas are not provided by the great concepts of the Constitution * * *" (Kirschbaum, 316 U.S. at page 526, 62 S.Ct. at page 1121) and none is provided here. "Practical considerations" are repeatedly emphasized (Overstreet, 318 U.S. at page 128, 63 S.Ct. at page 496; Vollmer, 349 U.S. at page 429, 75 S.Ct. at page 861). "What is required is a practical judgment * * *" (Armour, 323 U.S. at page 130, 65 S.Ct. at page 167; Roland, 326 U.S. at page 665, 66 S.Ct. at page 416). As has been noted above, it is a matter of drawing lines:

"And when lines have to be drawn they are bound to appear arbitrary when judged solely by bordering cases. To speak of drawing lines in adjudication is to express figuratively the task of keeping in mind the considerations relevant to a problem and the duty of coming down on the side of the considerations having controlling weight. Lines are not the worse for being narrow if they are drawn on rational considerations." 10 East 40th St. Bldg. Inc. v. Callus, 325 U.S. 578, 584, 65 S.Ct. 1227, 1230.

This "makes it all the more necessary to hew close to the line marked out by the specific facts of the cases before us" (Mr. Justice Frankfurter, dissenting, in United States Cartridge, 339 U.S. at page 523, 70 S.Ct. at page 769).

13. The employee has the burden of establishing that he is covered by the Act (Warren-Bradshaw, 317 U.S. at page 90, 63 S.Ct. at page 126; Schulte, 328 U.S. at page 120, 66 S.Ct. at page 931; Mt. Clemens, 328 U.S. at page 687, 66 S.Ct. at page 1192).

14. Each case must stand on its own facts (Swift, 323 U.S. at page 140, 65 S.Ct. at page 164; Mitchell v. Brown, supra, p. 362 of 224 F.2d).[6]

6. It is nevertheless interesting to observe the specific results in only the Supreme Court cases and without listing the results in the very numerous lower federal court decisions including our own which have been decided to this date. Thus we have holdings, either direct or upon admission, that the Act does apply to employees of a loft building whose tenants are engaged in the production of goods for interstate commerce (Kirschbaum); the rate clerk of an interstate motor transportation company (Overnight Motor); employees of a rotary drill crew whose task ceased at an agreed depth short of the oil sand stratum (Warren-Bradshaw); employees of a paper wholesaler's branch houses from which distribution did not cross state lines (Jacksonville Paper); employees of a toll road and drawbridge over the intra-coastal waterway in Florida (Overstreet); employees of a construction company building new replacement abutments and repairing sub-structures of bridges damaged by floods and used by interstate railroads (Pedersen); night watchman for manufacturing plant shipping most of its goods in interstate commerce (Southern Package); underground iron ore miners (Tennessee Coal); citrus fruit cannery employees (Holly Hill); on-call time of fire guards for a packing plant producing goods for interstate commerce (Armour; Swift); warehouse and central office employees of an interstate retail chain store system (Phillips); interstate manufacturer's office building employees (Borden); employees of a manfacturer and interstate servicer of electrical equipment (Roland); employees of a window cleaning firm doing contract work for customers engaged in interstate commerce (Michigan Window Cleaning; but see Zachry, 362 U.S. at

In spite of the recent reference (Mr. Justice Douglas for the dissenters, in Zachry, 362 U.S. at page 325, 80 S.Ct. at page 748) to the theretofore existing "symmetry of the judicial rulings under the Act", we must bear in mind that each of these cases, too, "must stand on its own facts", and that perhaps no de-cided case affords precise precedent for the ones now before us. It is our task to adopt a liberal approach where the stat-ute is applicable and yet to be aware that there is an area of regulation which Con-gress has left to the states; to be mind-ful of the fact that construction em-ployees may (Warren-Bradshaw; Peder-sen; Alstate; Hempt; Vollmer; Tobin v. Johnson, supra, and Tobin v. Penning-ton-Winter Const. Co., supra) or may not (Murphey; Zachry) be subject to the Act; and to be aware that the so-called new construction rule, which has been developed and applied in other areas of federal regulation,[7] does not now thwart coverage under this Act.[8] This may well involve the walking of a decisional tight-rope but we do so with the comfort that all the cases are close and that the lines are necessarily finely drawn.

Zachry, being not only the most recent expression of the Supreme Court but in-volving, as it does, construction em-ployees, deserves special mention. The employer there was constructing a Tex-as river dam designed to increase exist-ing reservoir capacity of a water supply district which included the City of Corpus Christi. The dam was not a multi-pur-pose project. The existing dam was to continue in use until inundated upon the completion of the new construction. Nearly half the water consumption from the system went to industrial users most of whom produced goods for commerce. Some water was consumed by facilities and instrumentalities of commerce. The Court mentioned many of the general rules outlined above and noted three cate-gories of activity to which the Act ap-plied: first, employment which was "in

page 317, 80 S.Ct. at page 744); em-ployees of a daily newspaper having less than one-half of 1% of outstate cir-culation (White Plains); employees of a service firm working on vehicles owned by a corporation engaged in interstate com-merce (Boutell); employees of a loft building, the tenants of which deliver their manufactured goods to local dis-tributors who ship them in interstate commerce (Schulte); employees of ir-rigation company supplying water to farmers who raise produce shipped in interstate commerce (Farmers Irriga-tion); employees of manufacturer op-erating government munitions plant un-der contract (United States Cartridge); off-the-road employees producing surfac-ing materials used on interstate roads and railroads (Alstate; Hempt); em-ployees of an agency furnishing watch-men, fire inspection and other services to an interstate retail system (Joyce Agency); sugar processing plant em-ployees (Waialua); employees of con-tractor building lock on new alternate route for intra-coastal waterway in Lou-isiana (Vollmer); non-professional em-ployees of architectural and engineering firm designing projects in more than one state (Lublin). We also have holdings that the Act does not apply to employees of a wholesale produce company receiv-ing some of its merchandise from other states but delivering only in Maine (Carr); a cook employed by a firm con-tracting to furnish meals to mainte-nance-of-way employees of an interstate railroad (Threlkeld); employees of a loft building the tenants of which are not engaged in manufacture (10 East 40th St.); interstate railroad employees in training (Portland Terminal); em-ployees engaged in the construction of a naval training camp and base depot (Murphey); employees of a construction company building a dam to increase a city's reservoir capacity (Zachry).

7. See Raymond v. Chicago, M. & St. P. Ry. Co., 243 U.S. 43, 37 S.Ct. 268, 61 L.Ed. 583, and the cases cited by the dissent in Vollmer, 349 U.S. at pages 432-433, 75 S.Ct. at pages 863, 864.

8. Vollmer, 349 U.S. at page 429, 75 S.Ct. at page 861 and Zachry, 362 U.S. at page 313, 80 S.Ct. at page 742. See Southern Pacific Co. v. Gileo, 351 U.S. 493, 500, 76 S.Ct. 952, 100 L.Ed. 1357; Lublin, 358 U.S. at page 213, 79 S.Ct. at page 264; Archer v. Brown & Root, Inc., 5 Cir., 241 F.2d 663, 664-665, certiorari denied 355 U.S. 825, 78 S.Ct. 33, 2 L. Ed.2d 39. The fact that construction is new, however, is not an irrelevant fac-tor in determining coverage (Zachry, 362 U.S. at page 319, 80 S.Ct. at page 745).

commerce" and the least affected by local interests; second, and a step removed, employment in "production for commerce"; and third, and furthest removed, employment in an activity which is only related to such production. It stated, at pages 313–314, 319 and 320 of 362 U.S., at pages 742, 745, 746 of 80 S.Ct.:

" * * * whether construction work is covered depends upon all the circumstances of the relation of the particular activity to 'commerce' in the statutory sense and setting, * *

" * * * As we held in Vollmer, that an activity is rightly called construction and is therefore distinct from operation, does not *per se* remove it from coverage. Construction may be sufficiently 'closely related' to production to place it in that proximity to 'commerce' which the Act demands as a predicate to coverage. * * *

" * * * What is finally controlling in each case is the relationship of the employment to 'commerce,' in the sense of the statute, and it needs no argument that as to that relationship this case is significantly different from Lublin or Vollmer."

Zachry, of course, has distinguishing factual features from those before us, centers upon the "production" clause rather than the "in commerce" clause of the Act and, furthermore, is a decision by a bare majority of the Court. The case is helpful, however, because (a) it emphasizes the limitations of the statute; (b) it recognizes that all work and particularly all construction work is not covered by the Act; (c) it gives emphasis to the three gradations of covered activity; (d) it stresses the need for considered judgment in the light of all aspects of the activity under review, and (e) its implications are not restricted to the "production" clause.

The foregoing principles and Zachry itself show the way, we feel, to the disposition of the present cases and

we affirm. We do so in the conviction, reached after a thorough review of this record and of the original exhibits, that the activities of these 29 employees are not within the vital phrases of the Act. We reach this conclusion in the light of the following factors:

A. The employees were certainly not engaged in the "production of goods for commerce" in spite of the allegations of the complaints and the argument evidently made in the trial court. The Secretary on this appeal does not seriously, if at all, urge coverage under this phrase of the statute. In any event, Zachry would appear to be conclusive opposing authority on that issue.

B. We are then concerned with fitting the work of these employees into the "in commerce" phrase. This is activity "least affected by local interests". Are these employees engaged in "trade, commerce, transportation, transmission or communication among the several States", as § 203(b) defines, and as Zachry outlines, 362 U.S. at page 316, 80 S.Ct. at page 743 in "activities of traditionally national concern" at "the hub of the national interest in 'commerce'" or does their work have a more ready relationship to what is essentially local activity?

C. Many of the decided cases, where coverage is found, involve the last phrase of the definition of "produced" (see footnote 3) which, Zachry tells us, 362 U.S. at pages 316–317, 80 S.Ct. at page 744, is "at the periphery of coverage" and "marking the outer limits of applicability". The present cases with their reliance on "in commerce" involve the "more exacting" test.

D. Congress, when it wants clearly to include an area of activity, knows how to use appropriate language (Holly Hill, 322 U.S. at page 616, 64 S.Ct. at page 1220; Polish Alliance, supra, at page 647 of 322 U.S., at page 1198 of 64 S. Ct.).

E. These employees were not engaged in the construction of the dam itself or

in the clearance work at the damsite. Their activities were in more remote areas and certain phases of their work, such as complete clearance down to Elevation 840, admittedly were occasioned solely by the anticipated public recreational use.

F. The trial court's findings that the clearing operations "were strictly of a local nature", at page 560 of 179 F.Supp., has support in the testimony of defendant's witnesses and also finds support from the Secretary's principal witness, J. C. Pyle, Chief Hydraulic Engineer with the Corps. Much of the cross-examination of Pyle is set forth in Judge Miller's memorandum. Mr. Pyle did state on direct that in his opinion the clearing work was a part "of the overall construction" and he gave an affirmative answer to the question whether the clearing was "desirable from the standpoint of reducing floating debris on the reservoir"; yet he also acknowledged that the design memorandum stated that the clearing was desirable for reasons other than floatage and that "the largest reason for the clearing was to promote the passage of boats". On cross-examination, he recognized the change, since the Norfork dam was built, in official attitude as to the necessity of clearance and admitted that one of the plans studied provided only "for a very small amount of clearing" at the "access points and the main public access"; that floating material would not bother the penstocks at all; that "that type of clearing in the vicinity is desirable * * * I would be inclined to say that it is not necessary * * *"; that he didn't expect trouble; that "it was cleared to control mosquitoes and for boat passage; the boats being primarily recreational boats" and that "this is not a navigation project". The testimony as to the purpose of the clearing thus, at best, is in conflict. The trial judge's determination as to this is essentially factual in nature and we are reluctant and unable to say that it is clearly erroneous.

G. Setting to one side this conflicting testimony, the changes in the Corps thinking and other items reviewed in the trial court's opinion, there remains the significant nature of the clearing itself. This alone almost compels the conclusion that protection of the dam, if it were present as a factor at all, was no more than a consequential motive in the clearing. Only a little over 14% of the reservoir shoreline was cleared; the major portion of the timbered area in the reservoir had no clearing of any kind; in the modified clearing areas any existing fallen trees and trash were allowed to remain; there was no clearing in the floodpool although water will rise to that level on occasion and at Bull Shoals flood-pool timber was killed by the flooding; complete clearing centered in the public access areas; and no clearing was done on opposite sides of the stream.

H. While we can accept the Secretary's proposition that the White River project must be viewed in its entirety, we are not convinced that it follows from this that every activity in connection with the project is covered by the Act. The argument would be stronger if Congress had used all its available constitutional power. Somewhere the line must be drawn. "There must be a cut-off point at some time * * *". Mitchell v. Hygrade Water & Soda Company, 8 Cir., 285 F.2d 362, 367.

I. We are not here concerned with an issue comparable to that of the validity of government taking as to which the cases (including our own recent United States v. Mischke, 8 Cir., 285 F.2d 628, 631) hold that, at least in the absence of arbitrariness, wisdom of decision is a legislative matter not subject to judicial review. We have involved here the interpretation and application of a statute.

J. We attach little significance to the fact that the funds paid defendant came from general appropriations allocable either to flood control or power. Mr. Pyle testified that all the costs were allocated to these two categories.

K. The legislative tendency since the passage of the original Act has been in the direction of limiting the broad interpretations which the courts have given the statute. This is evidenced by both the Portal-to-Portal Pay Act, c. 52, 61 Stat. 84, now 29 U.S.C.A. § 251 et seq., and the 1949 amendment to § 203(j). See Steiner, 350 U.S. at pages 253–256, 76 S.Ct. at pages 334–336; Zachry, 362 U.S. at page 317, 80 S.Ct. at page 744, and Mitchell v. Hygrade Water & Soda Company, supra, page 366 of 285 F.2d. We must heed that tendency and its judicial recognition.

The Secretary's alternative argument that, because one of the purposes of the clearing activities had a relationship to the passage of boats in the reservoir, and because the reservoir extends into two states, we are concerned with employment directed toward the improvement of navigability of a waterway of the United States and thus with employment plainly within the coverage of the Act, has its tantalizing aspects. We find no authority precisely supporting this contention. We think that the Secretary's argument is no more than part and parcel of, and not separate from, his main argument; that the fact there may be pleasure boats wandering into certain of the reservoir's tentacles stretching into adjacent Arkansas is only an incidental circumstance which does not make the present employees' activities of a kind the Act's "engaged in commerce" language was meant to embrace; and that this secondary issue is fully controlled by all that has been said on the primary point.

Tobin v. Pennington-Winter Const. Co., supra, which the Secretary urges upon us, must not be passed by. This is particularly so because the Supreme Court stated, at page 429 of 349 U.S., at page 861 of 75 S.Ct., that certiorari in Vollmer was granted to resolve an apparent conflict with Pennington-Winter. This Tenth Circuit case involved clearance work for a multi-purpose project. The decision, one judge dissenting, placed great emphasis upon the comprehensive character of the improvement plan and upon the fact that the recreation facilities "were a very small part of the project", and it regarded as of "vital significance" the fact "that the major portion of the work" consisted of the removal of possible obstructions which would interfere with the operation of the dam itself. It is not clear whether "in commerce" or "production" was primarily involved. In any event, the record before us, in contrast, brings out the primarily local or recreation aspects of the work performed. Much of this may be due, as the record indicates, to the change in engineering attitudes in the intervening years, tempered by experience, as to the non-necessity of clearance in projects of this kind. Be that as it may, we feel that if Pennington-Winter falls on one side of the fine line which courts must draw, the present cases are sufficiently different from it so as to fall on the other side. In any event, Pennington-Winter predates Zachry.

We have reviewed, undoubtedly at too great length, the many Supreme Court cases, the rules they promulgate, and the several factors which have influenced us in reaching our conclusion. Decision in this kind of case is, after all, perhaps only a question of touch and of tone. Although this may be one of the "hostile constructions" anticipated by the dissent in Zachry, 362 U.S. at page 325, 80 S.Ct. at page 748, we conclude that the work performed by these employees was activity essentially collateral and local in nature and not subject to the reach of the Fair Labor Standards Act.

Affirmed.