Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

John CORNELL, Defendant.

Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

Gerald WILLIAMS, Defendant.

Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

Kenneth RICHARDSON, Defendant.

Civ. Nos. 9003-9005.

United States District Court
W. D. Oklahoma.

Nov. 15, 1961.

Charles Donahue, Sol., U. S. Dept. of Labor, Washington, D. C., Earl Street, Regional Atty., and T. Hagan Allin, Trial Atty., U. S. Dept. of Labor, Dallas, Tex., for plaintiff.

Coleman Hayes, of Monnet, Hayes & Bullis, Oklahoma City, Okl., and Eph Monroe, Clinton, Okl., for defendant.

RIZLEY, District Judge.

These three cases were brought by the Secretary of Labor, United States Department of Labor, to enjoin the respective defendants from violating the provisions of Section 15(a) (2) of the Fair Labor Standards Act, 29 U.S.C.A. § 215 (a) (2). The cases were joined for trial as a matter of convenience as they arose out of similar fact situations and involve the same type violation. Jurisdiction over this action is conferred upon the court by Section 17 of the Fair Labor Standards Act, 29 U.S.C.A. § 217, hereinafter referred to as the "Act."

The defendants are contractors who contracted with the Soil Conservation Service of the United States Department of Agriculture to build the "earthen dams" or "water retarding structures," commonly referred to as farm ponds, in question here. They were furnished with certain specifications and regulations from which to base their bid, the job going to the low bidder. The specifications included the size and location of

the dam, the contract under which they were to work, and the regulations involved. It is significant that there was no reference made to the Act, and the testimony revealed that in no case did the contractor-defendants base their estimated labor costs on a scale paying wages commensurate with the requirements of that Act. There was, however, strict compliance with the Davis-Bacon Act, 40 U.S.C.A. § 276a et seq., better known as the "eight-hour law," and with the wage scale promulgated by the Secretary of Labor, as required in the contract.

The Government points out at great length in its brief that the structures in question fall within the category of flood prevention measures and provide runoff control for the Washita River Watershed. It is urged that these structures, by providing temporary storage of flood water from the major portion of the critical flood producing areas of the watershed will reduce peak discharges below the structures and materially reduce consequent flood water damage. The Washita River drains into the Red River which in turn eventually drains into the Mississippi; thus the Government contends that each dam built is designed to improve "the functioning of" or to be a "part of" an existing facility of commerce.

The Government further contends that while each of these structures in and of itself will have but an infinitesimal effect upon flood control that the effect of the plan in its entirety is great. Insofar as the whole plan is concerned, we must look at the overall watershed program, of which each dam is an integral part, and its effect on flood control, navigation, and commerce, itself.

It is the defendants' contention that each case, construing the term "commerce" in light of the Act, must hinge on its own facts and that in view of the nature of the work, the location of the project, and the remoteness from any facility or instrumentality of commerce, it is clear when tested by practical considerations that the work of the defendants' employees cannot be said to be "directly and vitally related" to interstate commerce.

The statute involved here establishes a fair minimum wage and the maximum hours that a person can work at that wage. Section 206(a) establishes the minimum wage:

"Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates * * * "

Section 207(a) is concerned with maximum hours:

"Except as otherwise provided in this section, no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

The Act was passed in 1938 and was declared constitutional and within the commerce power of Congress in the case of United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609 (1941). Since that time there has been a great deal of litigation [1] involving the Act. Most of it focuses on the question of whether or not a certain job, or the work product of that job, falls within the definition of "commerce" so as to require the compliance with the minimum wage and/or maximum hours provision of the Act. In order to properly approach the question at hand, it would be wise to go into the history of the interpretation of the Act. After it was passed, there was a rash of decisions which extended its coverage far beyond the anticipation of

1. Some 30 cases have been decided by the Supreme Court alone, see footnote 4 in the case of Goldberg v. Wade Lahar Construction Co., 8 Cir., 290 F.2d 408 (1961), which gives the citations to all of these cases.

Congress. For example, it was held that employees in a local store who sold fertilizer to local farmers for use on land that would produce goods sent out of the state were engaged in commerce.[2] Employees of a window-cleaning company, whose activities were wholly within the state, but whose customers engaged in interstate commerce were covered.[3] Employees of a local sawmill operator who produced and sold mine props within the state to interstate coal companies for coal mining were brought under the statute by judicial interpretation.[4]

Congress was disturbed at the extreme position taken in these and other cases and saw fit to confine and delimit the scope of the Act when they amended it in 1949. The intent of Congress was to keep the coverage of the Act within the logical and reasonable bounds of "commerce." The committee reporting on the amendment stated that: [5]

"The conference agreement inserts the words, 'closely related,' before the words 'process or occupation' and substitutes the words 'directly essential' for the words 'necessary' in the clause, so that the clause as amended refers to an employee employed 'in any closely related process or occupation directly essential to the production of goods.'"

Senator Taft, a member of the committee, submitted his own statement of the intent of the committee in this graphic language:[6]

"Likewise the conferees agreed to a redefinition of the term 'produced' intending to prevent extension of coverage to such operations as 'window cleaning' and 'grass cutting' on the far-fetched theory that such operations are necessary to the production of goods. * * * It was understood by both the House and the Senate conferees, however, that the definition as finally agreed to was intended to have a substantial limiting effect upon the coverage of the Act as heretofore interpreted by both the administrator and the courts."

With this background in mind, we must answer the question of whether or not the construction of these dams is "commerce" as defined under the Act.

The question of whether or not these contractors were involved in commerce must be answered on two counts. First it must be determined whether or not they were engaged "in commerce," and secondly, whether or not they were producing goods for commerce, or "were in any closely related process or occupation *directly essential* to the production thereof."

We shall consider first the question of whether or not the contractors were engaged "in commerce" as the Government's most serious contention is that this falls under the Act because flood control and navigation are so closely related to commerce. The cases which consider this phrase set out two tests which should be applied to these facts. The first "is not whether the employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it."[7] The second is stated, "whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it rather than an isolated local activity."[8] The courts have always said that "the test of whether one is *in* commerce is obviously more exacting than

2. McComb v. Super-A Fertilizer Works, 1 Cir., 165 F.2d 824.

3. Martino v. Michigan Window Cleaning Co., 327 U.S. 173, 66 S.Ct. 379, 90 L. Ed. 603.

4. Walling v. Hammer, 64 F.Supp. 690, (W.D.Va.).

5. 95 Cong.Record 14874.

6. 95 Cong.Record 14880.

7. McLeod v. Threlkeld, 318 U.S. 491, 63 S. Ct. 1248, 1251, 87 L.Ed. 1538.

8. Mitchell v. C. W. Vollmer, 349 U.S. 427, 75 S.Ct. 860, 862, 99 L.Ed. 1196.

the test of whether his occupation is necessary to production for commerce."[9]

The Supreme Court has just recently decided a case dealing with the question of whether or not workers constructing a dam come under the Act. In the Zachary case [10] it was held that construction workers working on a dam to furnish water to the city of Corpus Christi, Texas, were not engaged in or closely related to "commerce" under the Act. While the case was primarily concerned with the "production of goods for commerce" clause, it is still authority for the proposition that all construction work is not under the Act. It is authority for a situation such as the one at bar in that it involved the construction of a dam, and the dam was not multipurpose, or used as an actual facility of commerce. The implications of the case are not confined to the "production" clause. Because it involves essentially the same question, and is the most recent pronouncement from the Supreme Court, we think the following language is particularly applicable:

> "Construction may be sufficiently 'closely related' to production to place it in that proximity to 'commerce' which the Act demands as a predicate to coverage. Here, however, neither a facility of 'commerce' nor a facility of 'production' is under construction. Operation of the completed dam will merely support production facilities; and construction of the dam is yet another step more remote."

The court here summarily concludes that a dam used to retain water for the use of a municipality is not a facility of commerce. There was no way that it could be argued so the plaintiff had to revert to the argument that it was closely related to the "production" of goods in commerce.

The case at bar is similar in that the small water dams, or "water retarding structures," involved are in no way an *actual* facility of commerce. However, the Government argues that because this is an integral part of the flood control project in the Mississippi and related river basins it is so closely related to commerce as to be a part of it under the Act. We do not think that this argument is sound. To support the contention, the Government must use as its basic premise the contention that the scope of the Act is coextensive with the power of Congress to regulate commerce, and in this instance to construct these "water retarding structures" as part of a comprehensive flood control plan. This argument was expressly rejected in the Wade Lahar case,[11] which held that construction workers clearing brush on a large multiple-purpose dam, constructed with Government funds, did not come under the Act. The court in that case recognized the necessity of viewing the plan as a whole, but rejected the contention that the powers were coextensive.

> "While we can accept the Secretary's proposition that the White River project must be viewed in its entirety, we are not convinced that it follows from this that every activity in connection with the project is covered by the Act. The argument would be stronger if Congress had used all its available constitutional power. Somewhere the line must be drawn."

The same reasoning was used in the dissent in the Pennington-Winter case,[12] where Judge Murrah discussed the same point:

> "From there, the majority proceeds to reason that because Congress is constitutionally empowered to construct such projects, the Wage

9. Tobin v. Johnson, 8 Cir., 198 F.2d 130, 132 Cert. denied.

10. Mitchell v. Zachary Co., 362 U.S. 310, 80 S.Ct. 739, 742, 4 L.Ed.2d 753.

11. Goldberg v. Wade Lahar Construction Company, 8 Cir., 290 F.2d 408, 419 (1961).

12. Tobin v. Pennington-Winter Construction Co., 10 Cir., 198 F.2d 334, 337 (1952).

and Hour [Law] ipso facto covers all those employees engaged in such activities. But coverage under the Wage and Hour [Law] is not coextensive with the constitutional power of Congress over interstate commerce. Since the inception of the Act, the courts have recognized that Congress did not intend to extend it to all employees who might be engaged in some activity affecting interstate commerce."

We feel that the logic and weight of Judge Murrah's dissent is greatly enhanced by the recent Zachary, and Wade Lahar cases. The Pennington-Winter case is not controlling in this instance as it is applicable to multiple-purpose dams. The Wade Lahar case distinguishes it in that manner and is quick to point out [290 F.2d 420] "that if Pennington-Winter falls on one side of the fine line which courts must draw, the present cases are sufficiently different from it so as to fall on the other side. In any event, Pennington-Winter predates Zachary." We think that both of the above grounds for distinguishing the Tenth Circuit case are present in the fact situation at bar. The work in the present case was on an isolated dam rather than a multiple-purpose reservoir and, as implied in the Wade Lahar case, the Zachary case is the latest word on the subject.

In light of existing authority we cannot say that the employees working for the defendants were engaged in interstate commerce under the Act. The dams were not so closely related as to be in "commerce." They were not "vitally related to any instrumentality or facility in interstate commerce." In "practical effect" they can only be referred to as an isolated local activity.

The courts in the past have had a great deal of difficulty applying these general tests to the facts presented. It has required "painstaking appraisal of all the variant elements," and involves "matters of the nicest degree." [13] In the end, "the courts find themselves involved 'in the empiric process of drawing lines from case to case, and inevitably nice lines.' " [14]

In this case the responsibility of drawing lines has been relieved by recent and explicit cases holding on the points in question. The Zachary case holds that the employees building a dam to furnish water to a municipality are not covered under the Act, and the construction of said dam is not "in commerce," or " 'directly essential to the production' of goods for commerce." More to the point, the Wade Lahar case holds that the employees of a contractor who does work on a multiple-purpose dam are not covered under the Act, and the court directly dismisses the contention that because the construction is related to a flood control project, it falls within the scope of the Act. The line has been drawn and does not extend to small "water retarding structures" whose only purpose is flood control. If the decision were otherwise there would be no end to the interpretation of "commerce" in this field, and by some "far fetched theory" any labor done on farm terraces would be "in commerce." This is the sort of construction that Congress was attempting to avoid when they passed the 1949 amendment.

The Government next contends that the flood control aspects of these projects provide a basis for coverage under the "production of goods for commerce" language of the Act. They contend that the flood protection afforded to many concerns engaged in the production of goods for commerce, as well as crops, oil-and-gas-producing facilities, interstate railways, highways, and telephone facilities brings this construction under the Act.

The argument of the Government is that the dams protect industries concerned with production of goods for commerce from floods, and that this protec-

13. Zachary, 362 U.S. 315 and 321, 80 S. Ct. 743 and 746, 4 L.Ed.2d 753.

14. Wade Lahar, 290 F.2d 414.

tive function is essential to that production. Suffice it to say that this is a very tenuous argument and that all cases cited in support of it were decided before the 1949 amendment to the Act. We think the logic of the Zachary case is controlling. In that case, the court said that even though the water was needed for the production of goods in commerce, the building of the dam is one step removed, and therefore, not "directly essential" to the production of goods. Even if we were to concede the Government's argument that flood protection is vital to the production of goods for commerce, the building of the dam is one step removed. There was no evidence that the dams were being used to furnish water for irrigation or for the production of any goods for commerce.

As mentioned earlier, the contract and specifications to be used in the bid were provided by the Department of Agriculture. They required compliance with the Davis-Bacon Act and the wage scale set out by the Secretary of Labor. The pre-trial order stipulates that there was strict compliance with these provisions. Any time a person worked over eight hours in a day he was paid time and one-half his wage. The Government brings this action because of failure to pay time and one-half for all time over forty hours in a week even though the contract provides that there can be six nine-hour days of labor. On the one hand, the Department of Agriculture sets forth all the laws to be complied with and the maximum hours that may be worked in a week, then another Department comes along and says that another burden is superimposed upon the contractor. This is an undue burden and if the agencies of the Government are at odds as to what laws are to be applied to certain contracts, this should be worked out between them before the contracts are released for bids.

The prayer for permanent injunction is hereby denied and the cases are dismissed.