James P. **MITCHELL**, Secretary of Labor, United States Department of Labor, Appellant,

v.

Kenneth R. **BROWN**, doing business as Brown Engineering Company, Appellee.

No. 15258.

United States Court of Appeals Eighth Circuit.

July 12, 1955.

Sylvia S. Ellison, Atty., U. S. Department of Labor, Washington, D. C. (Stuart Rothman, Solicitor; Bessie Margolin, Asst. Sol.; Harry M. Leet, Atty., U. S. Department of Labor, and B. Harper Barnes, Regional Atty., Washington, D. C., were on the brief), for appellant.

Edgar Musgrave and Peter W. Janss, Des Moines, Iowa (Allen Whitfield and Gerald O. Patterson, Des Moines, Iowa, were with them on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and VOGEL, Circuit Judges.

WOODROUGH, Circuit Judge.

The Secretary of Labor brought this action to enjoin defendant Kenneth R. Brown, doing business as Brown Engineering Company, from violating Sections 15(a) (1) and 15(a) (2) of the Fair Labor Standards Act of 1938, as amended by the Fair Labor Standards Amendments of 1949, 29 U.S.C.A. § 201 et seq.[1] The District Court had jurisdiction of the action by virtue of Section 17 of the Act, 29 U.S.C.A. § 217. Plaintiff's complaint alleged that defendant had been and was continuing to violate the provisions of the Fair Labor Standards Act by "employing many of his employees in interstate commerce or in the production of goods for interstate commerce", for workweeks longer than forty hours without paying time-and-a-half overtime compensation for such work in excess of forty hours. The case was tried to the court sitting without a jury and all facts were stipulated before trial. The trial court adopted the stipulation as its findings of fact and issued a memorandum opinion incorporating therein its conclusions of law. Judgment was entered dismissing the complaint and plaintiff appeals.

The stipulation of facts shows that defendant is a professional or consulting engineer employing approximately 43 persons at his place of business in Des Moines, Iowa. His work, and that of his associates, consists of consultations with clients respecting engineering and architectural problems and the giving of advice and recommendations for the solu-

---

1. Sections 15(a) (1) and 15(a) (2) provide:

"(a) After the expiration of one hundred and twenty days from the date of enactment of sections 201–219 of this title, it shall be unlawful for any person—

"(1) to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 206, or section 207 of this title * * *.

"(2) to violate any of the provisions of section 206 or section 207 of this title, or any of the provisions of any regulation or order of the Administrator issued under section 214 of this title".

Section 207 provides:

"(a) Except as otherwise provided in this section, no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

tion thereof. After such consultations an engineering contract is entered into if the client determines to proceed with the proposed construction project. This contract consists essentially of two divisions or services to be performed by defendant.

The first part of the contract defines defendant's duties prior to the beginning of actual construction. Defendant agrees to make initial surveys and introductory investigations to produce the preliminary design of the construction contemplated; to thereafter prepare plans, specifications, drawings, designs and tabulations reflecting in detail the construction work to be performed; and to prepare estimate of cost, form of notice and bidding proposal, and form of contract between the client and the contractor. The client usually obtains bids on the proposed construction work but occasionally defendant sends the plans and specifications directly to the prospective bidders. The plans and specifications at all times remain the property of the defendant and a deposit is required from prospective bidders to insure their return. Where competitive bids are taken defendant is usually in attendance at the letting, examines such bids, consults with his client and recommends the bids to be accepted. The client decides to whom the contract shall be awarded.

The second part of the engineering contract relates to defendant's duties after the construction work is awarded to a contractor. Defendant agrees to furnish inspection service during the period of construction. The employee assigned by defendant to perform this inspection service is called a "resident engineer". His duties consist of inspecting all materials as they arrive at the job site to determine if they meet the specifications previously agreed to; inspecting the construction work to determine if the contractor is proceeding according to the plans and specifications; and making periodic estimates of the progress of construction, computing the percentage of moneys then earned by the contractor, and reporting such computations to the owner with recommendation for payment

thereof if the work completed is in accordance with the plans and specifications. Inspection service varies on different construction projects, sometimes being relatively constant while at other times only weekly or periodic inspections are required. Defendant and his employees do not engage in the actual construction work on a project and do not have the right or duty to direct or control the work of the contractor, except to the extent of making reports and recommendations on the work performed.

Defendant's fee for services rendered under the engineering contract is in virtually all instances based upon a percentage of the estimated cost of the project as determined by the plans, specifications and estimate of cost. The fee for inspection service under the second part of the contract is usually equal to one-half the amount charged for the preparation of plans and specifications under the first division of the contract.

The plans and specifications prepared by defendant and his employees are sometimes sent outside of Iowa to prospective bidders in other states, and occasionally the plans and specifications call for materials, parts, machinery, etc., which must be fabricated to order by factories and plants located outside of the state. Also, engineering contracts entered into between defendant and Rural Electric Cooperatives required that defendant submit his plans and specifications to the Administrator of the Rural Electrification Administration at Washington, D. C., for approval.

During the period from 1950 to 1953 the stipulation showed that defendant and his employees participated, to the extent and according to the terms of the above described engineering contracts, in construction projects, all located within the State of Iowa, which may be considered in two groups: (1) Those involving instrumentalities of commerce, and (2) those involving the production of goods for commerce.

(1). Instrumentalities of commerce.

(a). Preparation of plans and specifications for the paving of approximately

37 sections of existing streets in four Iowa towns. Interstate commerce moved over all of these streets both before and after paving.

(b). Preparation of plans and specifications for enlarging the power plant and for making other additions to existing equipment of an interurban railroad. Approximately 25% of the power produced by the railroad is used in the operation of its railway. A substantial portion of the freight hauled by the railroad is moving in interstate commerce.

(2). Production of goods for commerce.

(a). Preparation of plans and specifications for the installation of additional equipment in the municipal power plant of the city of Pella, Iowa. The power plant supplies electricity to various enterprises which ship a substantial portion of their products outside of the state.

(b). Preparation of plans and specifications for new headquarters buildings for three rural electrification cooperatives which distribute electrical energy to railroads hauling interstate freight and passengers; to factories producing goods for interstate commerce; to telephone networks and radio stations for interstate messages and programs; and to a state highway patrol for communications controlling interstate traffic.

The contracts for the paving of the streets and for the alteration and improvement of the Pella, Iowa, power plant all provided that the decision of the engineer as to the meaning of the plans and specifications, and as to whether the work was in accordance therewith, was final.

It was further stipulated that if defendant's employees come within the coverage of the Fair Labor Standards Act, the overtime provisions of said Act have been violated.

Upon the facts so stipulated the trial court was of the opinion that defendant's employees were neither engaged in commerce nor in the production of goods for commerce, as those terms are used and defined in the Fair Labor Standards Act.

It concluded that: "The effect of defendant's activities and those of his employees in commerce is too far removed from his main activities to have more than a remotely incidental effect."

Since the enactment of the Fair Labor Standards Act in 1938 the courts have been constantly called upon to determine whether a particular employee or group of employees in engaged "in commerce" or in the "production of goods for commerce". The difficulty has been in finding an acceptable standard for ascertaining whether an employee's activities bring him within the coverage of the Act. The Supreme Court recognized this difficulty in A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 520, 62 S.Ct. 1116, 1118, 86 L.Ed. 1638, when it said: "To search for a dependable touchstone by which to determine whether employees are 'engaged in commerce or in the production of goods for commerce' is as rewarding as an attempt to square the circle." In the final analysis, of course, each case must stand or fall on its own particular facts. In the course of reviewing decisions of lower courts in cases arising under the Act, the Supreme Court has announced several broad, guiding principles to be applied in determining coverage. These were reiterated in the very recent case of Mitchell v. C. W. Vollmer & Company, 75 S. Ct. 860, 862, thus:

"We are dealing with a different Act of another vintage [i. e., the Fair Labor Standards Act rather than the Federal Employees Liability Act]—one that has been given a liberal construction from A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, to Alstate Construction Co. v. Durkin, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745. The question whether an employee is engaged 'in commerce' within the meaning of the present Act is determined by practical considerations, not by technical conceptions. See Walling v. Jacksonville Paper Co., 317 U.S. 564, 570, 63 S. Ct. 332, 336, 87 L.Ed. 460; Over-

street v. North Shore Corp., 318 U.S. 125, 128, 130, 63 S.Ct. 494, 496, 497, 87 L.Ed. 656. The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity. See McLeod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248, 1251, 87 L.Ed. 1538. Repair of facilities of interstate commerce is activity 'in commerce' within the meaning of the Act as we held in J. F. Fitzgerald Const. Co. v. Pedersen, 324 U.S. 720, 65 S.Ct. 892, 89 L.Ed. 1316. And we think the work of improving existing facilities of interstate commerce, involved in the present case, falls in the same category."

■■ We consider first the correctness of the trial court's determination that defendant's employees were not engaged "in commerce". This involves consideration of the work performed by the employees on projects referred to in (1) above, to-wit, the preparation of plans and specifications for the paving of streets carrying interstate traffic and for enlarging the power plant and making other additions to existing equipment of an interurban railroad, also carrying interstate traffic. Concededly, this work consisted of repairs, alterations, additions and improvements to existing facilities and did not constitute "new construction", as in, e. g., Murphey v. Reed, 335 U.S. 865, 69 S.Ct. 105, 93 L.Ed. 410. Nor can there be any doubt that the streets and interurban railroad in this case, both carrying persons and goods between states, were instrumentalities of interstate commerce. See Overstreet v. North Shore Corp., 318 U.S. 125, at page 129, 63 S.Ct. 494, 87 L.Ed. 656. The issue, therefore, reduces itself to whether the activities of defendant's employees in connection with these projects were so "directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity." Mitchell v. C. W. Vollmer & Company, supra.

■ In concluding that the employees in this case were not engaged "in commerce", the trial court based its decision on McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538; Collins v. Ford, Bacon & Davis, Inc., D.C.Pa., 66 F.Supp. 424, and D.C., 71 F.Supp. 229; and Kelly v. Ford, Bacon & Davis, Inc., 3 Cir., 162 F.2d 555. The test laid down in McLeod v. Threlkeld, supra, for determining whether a person is engaged "in commerce" under the Fair Labor Standards Act was restated by the Supreme Court in Mitchell v. C. W. Vollmer & Company, quoted in part above. In Collins v. Ford, Bacon & Davis, Inc., D.C.Pa., 66 F.Supp. 424, defendant was supervising the construction of a plant for the Jacobs Aircraft Engine Company of Pottstown, Pennsylvania. Plaintiff, an employee of defendant, contended he was engaged "in commerce" because he prepared plans and drawings for defendant which were sent outside of the state and were used by contractors in submitting bids for construction work on the plant at Pottstown. The court granted summary judgment for defendant, holding that defendant itself was not engaged in commerce because the work was original construction and that plaintiff's activity in preparing plans and drawings which were sent outside of the state was not sufficient to bring him within the "in commerce" phrase of the Fair Labor Standards Act. The case was reopened in 71 F.Supp. 229 to allow plaintiff to file a supplemental affidavit to bring himself within the "production of goods for commerce" phrase of the Act. The court held that the plans and drawings prepared by plaintiff were not "goods" within the meaning of the Act even though they may have something to do with ultimately moving goods in commerce. The Court also reiterated its views that plaintiff was not engaged "in commerce" and reaffirmed its order of summary judgment for the defendant. In Kelly v. Ford, Bacon & Davis, Inc., 3 Cir., 162 F.2d 555, plaintiff's duties were

confined solely to processing extra work orders in connection with the construction of a new factory. The court held, inter alia, that, even though material and equipment came into the state as a result of these work orders, plaintiff's duties were not closely enough connected with interstate commerce to bring him within the coverage of the Fair Labor Standards Act. We think it significant that in both the Collins and Kelly cases, unlike the present one, plaintiff's activities were in connection with the construction of a new factory designed for the production of goods. In this case the activity of defendant's employees was in connection with the repair, alteration and improvement of existing instrumentalities of interstate commerce. Their duties, beyond the preparation of plans and specifications for a proposed construction project, required their presence at the job site as "resident engineer". Although the "resident engineer" did not remain at the project at all times, the stipulation shows it was his duty to inspect all incoming materials to determine if they measured up to specifications; to inspect work completed by the contractor to ascertain if it conformed to the plans and specifications; and to make progress reports to the owner and recommend payment of moneys earned under the contract if the contractor's work was satisfactory. The inference is fairly deducible that the work of the "resident engineer" was a vital factor affecting the progress of the construction project. Further, although the stipulation recites that the "resident engineer" has no right or duty to direct or control the contractor in his work, the fact remains that completion of a project depends in no small way upon the services rendered by defendant's employees. The street paving contracts between the various municipalities and contractors in this case provided:

"The Engineer shall decide any and all questions which may arise as to the quality and acceptability of materials furnished, work performed, and as to the manner of performance and rate of progress of said work. He shall decide all questions which may arise as to the interpretation of the specifications, or plans relating to the work, and the fullfillment of the contract on the part of the contractor, and all questions as to the rights of different contractors on the project. The Engineer shall determine the amount and quality of the several kinds of work performed and materials furnished which are to be paid for under the contract."

To hold that the "resident engineer" exercises no control over the work of the contractor and does not perform a vital function in the total activities of a construction project, is to turn away from the realities and practical considerations of the situation and be guided by technical conceptions, contrary to the teaching of the Supreme Court in Mitchell v. C. W. Vollmer & Company, supra.

That defendant's employees performed no actual manual labor on the projects under repair and improvement appears not to be of controlling consideration. We find no requirement in the Fair Labor Standards Act that they do so. In Laudadio v. White Construction Co., 2 Cir., 163 F.2d 383, 386, it was held that plaintiff's work, which consisted of making drawings and plans for the extension of existing instrumentalities of commerce and of preparing " 'bills of material' ", was "essential" to the repairs and alterations made by other employees of defendant and was "sufficiently closely related to the movement of commerce to justify a holding that the plaintiffs were 'engaged in commerce' ". So here, defendant's employees' preparation of plans and specifications for the repair and improvement of existing instrumentalities of commerce, together with the activities of the "resident engineer" at the actual job site, were sufficient to bring them within the coverage of the "in commerce" phrase of the Fair Labor Standards Act.

The case of Ritch v. Puget Sound Bridge & Dredging Co., 9 Cir., 156 F.2d 334, 337, appears to be directly in point and well-considered authority for holding

that defendant's employees in this case are engaged "in commerce". In that case defendants were dredging contractors engaged in the dredging and improvement of two channels in the harbor of the Bremerton Navy Yard in the navigable waters of Puget Sound, used extensively for interstate commerce. The court observed and held:

"The dredging contractors paid time and a half for overtime to all its employees engaged in constructing the channels, berths, retaining walls and pier, except the appellants [plaintiffs] and six others. The distinction seems to be made on the theory that they were so-called 'White Collar' workers. Five of them were draftsmen engaged in designing and laying out the work to be done by others in the contracted dredging and dredging plant on the pier with its retaining walls. Three were timekeepers engaged in keeping the time of all who worked on the project. In our opinion they were as much engaged in the construction of the channels inward from Puget Sound and the retaining walls and dredging installation on the pier to keep open the channels and berths as were the men dredging the channels and berths, the cement men working on the retaining walls and the mechanics installing the permanent dredging apparatus on the pier —all pursuant to the draftmen's plans and the time kept by the timekeepers. Since such work is in commerce, the men so actually engaged in it are in commerce and entitled to time and a half pay for their admitted overtime work. They have the immediacy of participancy lacking in the cook of McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538 cited in Armour & Co. v. Wantock, 323 U.S. 126, 131, 65 S. Ct. 165, 167, 89 L.Ed. 118."

The fact that plaintiff's immediate employer was performing the actual construction and repair work in the Ritch case, whereas defendant was not so employed in this case, is of minor significance. Questions of coverage under the Fair Labor Standards Act are determined on the basis of the employee's activity and not by the nature of the employer's business. Overstreet v. North Shore Corp., supra.

Viewing the activities of defendant's employees in a practical aspect in relation to the whole construction project, and giving to the Fair Labor Standards Act the liberal interpretation required, we are convinced that the stipulated facts in this case demand a holding that the employees were engaged "in commerce" and that the trial court's conclusion to the contrary was erroneous. We have considered all of the contentions, cases, legislative history and administrative interpretation presented in appellee's brief and oral argument but none appear to require a different result.

Holding, as we do, that defendant's employees were engaged "in commerce" within the meaning of the Fair Labor Standards Act, it is not necessary to consider plaintiff's further argument that they were also engaged in the "production of goods for commerce".

Reversed.