Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

NELLO L. TEER COMPANY, Defendant.

No. C–60–D–61.

United States District Court
M. D. North Carolina,
Durham Division.

July 14, 1962.

William Fauver, U. S. Dept. of Labor, for plaintiff.

Charles B. Nye and Jerry L. Jarvis, Durham, N. C., for defendant.

PREYER, District Judge.

This action was brought by the plaintiff's predecessor to have the defendant enjoined from violating the minimum wage (Sections 6 and 15(a) (2)), overtime (Sections 7 and 15(a) (2), and record keeping (Sections 11(c) and 15(a) (5)) of the Fair Labor Standards Act of 1938, as amended (29 U.S.C.A. § 201 et seq.), hereinafter referred to as the "Act".

The questions to be decided by this court are: Were the acts of the defendant complained of in interstate commerce and covered by the Act, and if they were, should defendant be enjoined from further violations of the Act.

The defendant is, and at all times hereinafter mentioned was engaged in numerous construction projects, including, but not limited to, the production, supplying and application of construction materials such as crushed rock, gravel, sand, and other earth materials used in connection therewith, and in the construction, reconstruction, and improvement of public highways and roads, airports, aircraft taxiways and runways, and other instrumentalities of commerce, located in the Eastern United States.

It is stipulated that defendant's employees on all these various projects, wherein occurred the alleged violations complained of, regularly worked in excess of 40 hours per week, and defendant failed to pay such employees for all their hours in excess of 40 per week at rates not less than one and one-half times the regular rates at which they were employed. The defendant, in effect, admits it violated the act if it was engaged in interstate commerce within the meaning of the act.[1]

## I.

1. It is stipulated that defendant's work on the Voice of America Projects was performed during the period from February 13, 1960, to January 10, 1961, at 3 sites located in and around Greenville, North Carolina.

Defendant's work under this contract involved the necessary grading, clearing and preliminary roadwork on the sites, as well as drainage, for the location of transmitter facilities of the Voice of America which are under construction at the said sites. The over-all Voice of America project, for which the defendant performed the above services, is the construction of a new Voice of America radio station consisting of various transmitters in and around Greenville, North Carolina. The new radio station, when completed, is scheduled to regularly transmit broadcasts into Europe, Africa, the Middle East and South America as a replacement and substitute for the transmission facilities now located in New Jersey and New York.

We agree with the plaintiff that defendant's work was in interstate commerce. In Bennett v. V. P. Loftis Company, 4 Cir., 167 F.2d 286 (1948) the defendant was engaged in the construction of a concrete bridge. The new bridge was to replace an existing bridge on a highway over which interstate traffic passed. After the completion of the new bridge the old one was to be abandoned and the highway moved so as to be connected with the new bridge which would then be put into use. Defendant was only engaged in constructing the replacement bridge and had nothing to do with moving the highway. No interstate traffic passed over the replacement bridge while the defendant was constructing it. The question before the court was whether the plaintiff, who was employed as a night watchman in and around the construction site as were some of these employees, was engaged in commerce within the meaning of the act. The court found that the work of the night watchmen was just as indispensable to the completion of the job as the work of any of the other employees and was in commerce. The court then discussed

1. With respect to overtime and record keeping violations involving certain employees and discussed on page 558 of this opinion, the defendant admits coverage but denies any violation of the provisions of the Act.

the "new construction" doctrine, upon which the defendant in this case primarily relies, citing authority, and then concluded "the new construction doctrine has no bearing on the instant case, because the bridge here in question, although a new structure, was being built to replace an existing structure which had long been used in interstate commerce."

We think the Loftis case is applicable and controlling in the present case. The construction of the transmission facilities of the Voice of America project at Greenville was as a replacement and substitute for existing facilities, and an enlargement of an existing world-wide system of instrumentalities of interstate and international commerce.

In Mitchell v. Five Boro Construction Company, 1st Cir., 291 F.2d 371 (1961), cert. den. Five Boro Const. Corp. v. Goldberg, 368 U.S. 900, 82 S.Ct. 179, 7 L.Ed. 2d 95, defendant's employees were engaged in "constructing a transmitter building, a communications center building, a receiver building, three power plants, all support buildings and utilities which, when finished were to take their place as a communication relay center of the Army Communication Administration Network" in Puerto Rico. These facilities had never existed before, but their purpose was to improve an existing world-wide Army communication network by establishing a new relay station in Puerto Rico to enhance and improve the world-wide reception and transmission of messages. The employees were engaged in construction of the buildings and not the installation of radio equipment. The court agreed that this was new construction but held that nevertheless the project was in commerce and said: " * * * the distinction between new construction and repairs has been expressly rejected by the Supreme Court as a determinative touchstone whereby to decide the coverage of the Act."

The facts in the case at bar are even stronger than those in the Five Boro case as the facilities here were to replace those already being used in interstate

commerce, and to improve and expand the world-wide communication system of the Voice of America project. See Mitchell v. C. W. Vollmer & Co., Inc., 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196, (1955). There the court did not apply the new construction doctrine. Justice Frankfurter in the dissent says the test is in effect being abandoned. See also Mitchell v. H. B. Zachry Co., 362 U.S. 310, 313, 80 S.Ct. 739, 4 L.Ed. 753 (1960). The court there said the Vollmer case expressly rejected the new construction doctrine and further that " * * * whether construction work is covered depends upon all the circumstances of the relation of the particular activity to 'commerce' in the statutory sense and setting." See also Mitchell v. Hodges Contracting Company, 5 Cir., 238 F.2d 380 (1956).

The defendant relies strongly on the Zachry case, supra, for the proposition that new construction is not per se within the act. We agree with defendant on this and that the test is as set out by the court above in Zachry. A logical interpretation of this would be that the fact that new construction is involved does not necessarily mean the activity is within or without the act, but rather that the fact that new construction is involved is a fact to be considered along with all the other facts and circumstances in determining whether the activity is covered or not. This is the defendant's contention, but the Zachry case is distinguishable from the Loftis and Five Boro cases on the facts. The latter two cases dealt with the question of whether an activity was itself in commerce while Zachry dealt with the production of goods for commerce.

██ In the present case the defendant went into land which was both swampy and undeveloped to prepare a site for facilities which would be in interstate commerce. These facilities were to be later constructed by another contractor. The defendant's position is that the employees here were not so directly and vitally related to the functioning of an instrumentality or facility of inter-

state commerce as to be, in practical effect, a part of it rather than an isolated, local activity. The test to be applied is the one set out in Zachry. In applying the test we believe that to accomplish the purposes of the act the project must be viewed as a whole and not broken down into various isolated parts. This is the view expressed in Loftis, supra. We believe that the work done by the defendant is directly and vitally related to the functioning of the radio transmitters of the Voice of America project because without the roadwork and grading done by the defendant the construction of the facilities could not have been effected and they could not function as planned. We conclude that the work of the defendant was directly related to the Voice of America project and the employees were engaged in commerce within the meaning of the Act. See Mitchell v. Lublin, McGaughy & Associates et al., 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959), where it was held that the employee of an architect who prepared the plans, specifications, etc. for interstate instrumentalities and facilities were in commerce. The employees of the defendant in the present case were certainly not any more remote from the stream of commerce than were the employees who prepared the plans for the project.

2. It is stipulated that defendant performed the work on its Seneca River projects during the period from July 23, 1960, to November 11, 1961. There were two separate projects there, but the same law concerning coverage is applicable to both.

a) The comprehensive plan for the development of the Savannah River is an 11-project plan calling for the construction of reservoirs and dams at Clark Hill, Hartwell, and nine other places. The Clark Hill Dam and Reservoir was completed in 1954. It has increased the minimum flow of the Savannah River from Augusta to Savannah so as to produce a navigable channel depth of 7 feet at ordinary summer low-water. It has thus improved navigation on the Savannah River and has protected numerous crop lands used to produce crops for interstate commerce and has protected from flooding numerous interstate roads, streets, highways, bridges and railroads located in the Basin area. The Hartwell Dam and Reservoir is the second project of the comprehensive Savannah River basin plan. A network of interstate railroads and interstate hard-surfaced all-weather highways provide good transportation facilities in the drainage basin of the Hartwell project; such railroads and highways will be protected at various points from flooding upon completion and operation of the Hartwell project. The Hartwell project will be operated in conjunction with the Clark Hill project for flood control, navigation, hydroelectric power and other purposes. The Hartwell Reservoir will increase the minimum navigable depths on the Savannah River below Augusta from 7 feet (the level resulting from Clark Hill Dam and Reservoir) to 8 feet. The original plan, Plan 660, was objected to by Clemson College on the ground that the plan would result in inundation of bottom lands (its dairy farms) and irreparable damage to the college. The ultimate plan arrived at after extensive restudy is Plan 660-Plan X, which provides for the accomplishing of the original 660 contour level desired to accomplish the over-all purposes of the Hartwell project and the comprehensive Savannah River Basin Project, with protection of Clemson College lands through the construction of a diversionary channel of the Seneca River around the important lands of the college. The work performed by Nello L. Teer Company was the construction of two diversion dams and a diversion channel on the Seneca River to accomplish Plan 660-Plan X.

It is plaintiff's position that defendant's contract work constituted an integral and indispensable part of a multiple-purpose project constructed with Federal funds for the comprehensive development of the Savannah River Basin for the combined purposes of navigation, improvement, flood control, power, and other beneficial uses. Further the plaintiff contends that as the work was a necessary and indispensable part of the

whole project it should not be viewed as local isolated activity.

It is defendant's position that its work at the Seneca River project related solely to the protection of certain properties of Clemson College from being inundated by rising waters of the Hartwell Reservoir, in contrast to the over-all construction of the main dam, which defendant admits would be used in interstate commerce. Therefore, the defendant contends since its work was in no way related to the functioning of the dam it related solely to an isolated local purpose. The defendant stresses the fact that the plan, Plan 660-Plan X, upon which it worked was not the original plan, and that the original plan was changed because of protests from the officials of Clemson College, and that therefore the change was a result of the local protest and the work performed by the defendant was solely for the protection of these local interests.

We think that the fact that one plan rather than another is adopted by the government is immaterial insofar as the courts are concerned. It is a legislative prerogative as to how a project shall be accomplished and it is not the prerogative of the court to inquire into why the legislature decided on one plan as opposed to another. This would seem to follow from a reasonable construction of the language in State of Oklahoma ex rel. Phillips v. Atkinson Co., 313 U.S. 508, 520, 534, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941) and Anderson v. Seeman, 5 Cir. 252 F.2d 321 (1958), cert. denied, 358 U.S. 820, 79 S.Ct. 32, 3 L.Ed.2d 61.

There is ample authority to support the plaintiff's position that the project must be viewed in its entirety. See Tobin v. Pennington-Winter, 10 Cir., 198 F.2d 334 (1952), citing the Atkinson case, supra; Bennett v. Loftis supra, Mitchell v. Brown, 8 Cir., 224 F.2d 359 (1955). In Goldberg v. Wade Lahar Construction Co., 8 Cir., 290 F.2d 408, 419 (1961), upon which the defendant heavily relies, the court recognized and applies this principle.

The Lahar case, supra, tends to support the defendant while the Pennington case, supra, tends to support the plaintiff. While the distinction between these cases is not entirely clear-cut, an important difference is that in Pennington the court found the clearing of the land was necessary to effectuate the purposes of the dam, while in Lahar the court found the clearing of the land was not necessary to the operation of the dam and was solely to provide a recreation area for the local residents. If these cases are at odds, it is on what the facts in each case mean and not what the applicable law is on the meaning of the facts as determined. But assuming arguendo that there was a conflict between the 8th and the 10th circuits and that the Lahar case is now the law on the point there involved, we think the facts of the present case are distinguishable from the facts in either Lahar or Pennington. We will confine our analysis to the Lahar case as the defendant relies so heavily on it. In that case the government had determined that it was unnecessary to clear the reservoir area as the dam would function properly without it. Due to the protests of local citizens the government decided to clear a considerably larger area in order to provide recreational facilities for local use. The court had this to say: "While we can accept the Secretary's proposition that the White River project must be viewed in its entirety, we are not convinced that it follows from this that every activity in connection with the project is covered by the Act. * * * Somewhere the line must be drawn." The court then looked at the entire project to see how the defendant's work related to it. It found that the dam and reservoir would function just as well without the defendant's work, and that in fact the only value of the work performed was to provide local recreational facilities. The court realized it was dealing with a close case and that many times these cases turn on nice distinctions. "Decision in this kind of case is, after all, perhaps only a question of touch and tone." The court drew the

line this side of finding that defendant was engaged in commerce within the meaning of the act.

■ In the present case Plan 660-Plan X viewed as a part of the whole Savannah River project, which defendant admits is in commerce, reveals the following facts: As a part of the Hartwell project the defendant was to construct two diversion dams and a diversion channel on the Seneca River and a dike along Hunnicutt Creek. As we understand the facts, these constructions were necessary to effectuate Plan 660-Plan X, and they determined whether certain parts of the surrounding area would become a part of the reservoir or not. As the reservoir itself was admittedly in commerce, we think that construction work which determines to some extent what land will be included in the reservoir is likewise in commerce. In reaching this result the court has not been unmindful of the broad language used in Zachry, but as stated above, it is distinguishable from this case on the facts and we do not believe our decision here is in conflict with the principles laid down in Zachry.

■ b) Due to the future inundation of parts of U. S. Routes 76 and 123, when the Hartwell project is completed, it became necessary to relocate parts of both of these routes. Defendant performed embankment work on both of these relocated highways. It is stipulated that during the time the defendant performed this work on these routes they were in full use by regular interstate traffic. The defendant in his brief seemed to treat the work done on Routes 76 and 123 as an integral part of its work on the Seneca River project and in this we concur. Therefore the law discussed above as to the other work done on this project is also applicable here. In passing it may be said that the result here would be the same even if we should look at the work done on these two highways as being a project separate and apart from the main Seneca River project. See

Overstreet v. North Shore Corporation, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656; Bennett v. V. P. Loftis Co., 4 Cir., 167 F.2d 286 (1948); Mitchell v. Emala & Associates, Inc., 4 Cir., 274 F.2d 781 (1960).

We conclude that the work done by the defendant on both the Voice of America and Seneca River projects was in interstate commerce and was covered by the Act.

■ With respect to a number of employees, defendant admits coverage under the Act but denies any violation of the provisions of the Act. Without reciting in this opinion all of the facts involved, the court finds from the stipulations and the testimony at the trial that defendant violated the overtime and/or record keeping provisions with respect to those employees named in the Findings of Fact and Conclusions of Law.

■ Plaintiff further asks for a declaration that a certain Contract of Hire used by defendant in some instances is violative of the overtime provisions of the Act. We find that a ruling on this point is not essential to the decision of the case, and we therefore decline to consider it on the principle that the court will not render a purely advisory opinion.

## II.

Should the defendant be enjoined from further violating the Fair Labor Standards Act?

■ The defendant contends that even if it is found that it has violated the Act that nevertheless an injunction should not issue as defendant has at all times acted reasonably and in good faith. There is no question about the high standing of the defendant and the persons involved. Also, the defendant points out that as evidence of its good faith it has installed an expensive IBM system to facilitate record keeping. The court agrees that this is an indication of good faith.[2]

---

2. An employer's assurances of future compliance do not justify denial of an injunction against future violations, per se.

Mitchell v. Pidcock, 299 F.2d 281, 5 Cir., 1962; Mitchell v. Hausman, 5 Cir., 1958, 261 F.2d 778.

On the other hand the defendant has been investigated several times over the past three years for alleged violations of the Act. In some instances the defendant agreed to comply and in others it refused, basing refusal on the theory that it was not covered on that particular project. The defendant has profited by some $32,000 by failing to comply with the Act while performing work at Andrews and Seymour Johnson Air Force Bases, the statute of limitations having run on the claims of the employees for overtime pay. The work at these bases took place after the case of Mitchell v. Empire Gas Engineering Co., 5 Cir., 256 F.2d 781 (1958) was decided. Under this case these projects at the air force bases were clearly covered. Investigators advised defendant that these projects were covered and defendant did not choose to comply.

■ Each case must be decided on its own facts as to whether an injunction should issue. The court should consider, among other things, the conduct of the defendant in the past, what the defendant has gained from the violation and whether he acted on reasonable grounds when the violations occurred. When there have been past violations and investigations the courts are more apt to issue an injunction. The government has only a limited number of investigators and each investigation requires considerable money and time. When there has been a number of investigations of the same person or firm it is obvious that if the accused had been forced to comply with the law after an earlier violation was detected then the time and expense of a later investigation could have been spent elsewhere. There is no good reason why the defendant should not comply with the law. As the court said in Mitchell v. Ballenger, 5 Cir., 299 F.2d 297 (1962), "As the years pass by and the Act and its coverage become more and more a part of employer-employee relations, we find it more frequently necessary to direct the entry of a decree of injunction * * * than has heretofore been the case."

The defendant contends it acted reasonably and in good faith and that it reasonably believed the projects in question were not covered by the Act. But as pointed out above, the Empire case was decided before the work at the Air Force Bases was started, and the Secretary of Labor on various other occasions notified the defendant of violations. Mitchell v. Ballenger, supra, offers an almost exact parallel; in Ballenger, the Empire Gas case covered the precise point in issue, and had been decided prior to the alleged violation. The court granted an injunction, saying:

"The very apparent remedial purpose of this Act is too often overlooked where an employer has actually profited from his failure to comply with the law, and where his persistence in such failure, still to his profit, extends beyond the time when by all reason his doubts or uncertainties as to coverage should have vanished. This we think is such a case. * * * we are * * * compelled to find that, under the circumstances of this case, the failure of Ballenger to pay the legally required wages for a period of more than nine months after this Court's decision in Empire Gas, at a time when it was conscious of constant demands by the Department of Labor that it come into compliance, and at a time when this precise point was being litigated, and which time involved three months after actual notice to its counsel and six weeks after actual notice and advice to its President, deprives it of any defense against the Government's claim that an injunction be issued."

If a party relies on unclear law he must exercise reasonable judgment in following it. He does not have an unlimited right to challenge the law. The Empire case clearly brought the work at the Air Force Bases within the coverage of the Act. If the defendant had offered to reimburse the employees at these projects after coverage was finally determined and had set up an escrow fund to reimburse the employees employed at the Voice of America Projects and the Seneca River

Projects in case it was later determined that they were covered by the Act then the good faith of the defendant would be well-nigh unquestionable.

An injunction will work no great hardship on the defendant. It will only require it to comply with the law which it is already under an obligation to do, and if there are further violations alleged by the plaintiff, it will shift the burden of proof to the defendant to prove compliance. "We do not say or imply that injunctions should be issued freely, without regard for the facts, simply because it is the Government asking for the injunction. We say that the manifest difficulty of the Government's inspecting, investigating, and litigating every complaint of a violation weighs heavily in favor of enforcement by injunction—after the court has found an unquestionable violation of the Act." Mitchell v. Pidcock, supra.

The Court, therefore, concludes that an injunction should be granted.